UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

       v.

AKAZOO S.A.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 1:20-CV-08101 (AKH)


**MEMORANDUM OF LAW ON BEHALF OF DEFENDANT AKAZOO S.A. IN OPPOSITION TO THE SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY APPLICATION FOR AN ASSET FREEZE AND OTHER RELIEF**


GIBSON, DUNN & CRUTCHER LLP
Randy M. Mastro
Mark A. Kirsch
Christopher M. Joralemon
200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000

*Attorneys for Defendant Akazoo S.A.*

## TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ........................................................................ 1

**FACTUAL BACKGROUND** ............................................................................ 5

    **A.**    The MMAC-Akazoo Business Combination ........................................ 5

    **B.**    The Company Acted Swiftly to Identify the Fraud and Immediately Self-Reported to the SEC and Began Cooperating. ........................................ 6

    **C.**    At the SEC's Request, the Company Repatriated Its Funds to the United States. ........................................................................................................ 9

    **D.**    The Company Is Pursuing a Proposed Global Settlement and Business Transaction for the Benefit of Its Shareholders. .................................... 10

        **1.**    Global Resolution .......................................................................... 10

        **2.**    Business Transaction ..................................................................... 11

**ARGUMENT** ................................................................................................... 15

    **A.**    The SEC's Asset Freeze Would Have Deleterious Effects On the Company and Its Shareholders and Must Be Include a Carve-Out for Ongoing Company Expenses. ............................................................... 15

    **B.**    The SEC's Additional Requested Relief Is Unnecessary and Unduly Burdensome .................................................................................... 18

        **1.**    The Commission's Request for Repatriation Is Effectively Moot .......... 18

        **2.**    The Sworn Accounting Sought By The SEC Is Unncessary and Unduly Burdensome .................................................................. 18

        **3.**    The SEC's Proposed Order Also Contains An Overbroad Request for Additional Company Information. ................................................ 19

**CONCLUSION** ............................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*S.E.C. v. Gonzalez de Castilla*,
    145 F. Supp. 2d 402 (S.D.N.Y. 2001)........................................................................16

*S.E.C. v. Manor Nursing Ctrs., Inc.*,
    458 F.2d 1082 (2d Cir. 1972)................................................................................13

*S.E.C. v. Sonja Anticevic, et al.*,
    2005 WL1939946 (S.D.N.Y. Aug. 5, 2005)..........................................................16

*S.E.C. v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990)................................................................................13

## PRELIMINARY STATEMENT

In seeking "emergency" relief to freeze all of Akazoo's cash-on-hand, the SEC presents a very misleading picture of what is really happening here.  It displays a fundamental misunderstanding of a potential deal that could enhance shareholder value without using the Company's cash-on-hand—which, subject to expenses, is being conserved for distribution to shareholders.  And, in remarkably short-sighted fashion, the SEC now jeopardizes the very real chance to unite stakeholders and help make them whole—something that cannot possibly happen from cash-on-hand alone.  This Court should have none of it or, at the very least, order an approximately 20 percent carve-out of the Company's more than $30 million cash-on-hand that permits the Company to continue to pursue this deal, provide D&O coverage to its directors and reconstituted management team (without which it would not make sense for them to continue their service), cover accounts payable and operating expenses, and retain counsel to protect its interests.

What makes the SEC's position even more inexplicable is its rush to judgment and lack of any attempt whatsoever to understand the true facts here.  Indeed, it was Akazoo that investigated and self-reported the fraud to the SEC and another U.S. governmental authority, terminated the employment of the person believed to be principally responsible for the wrongdoing, reconstituted its management team, complied and continues to comply with the SEC's subpoena and document requests, and even arranged, at the SEC's request, for more than $30 million in Company cash-on-hand to be delivered from overseas to a U.S. bank—only to see the SEC immediately race to court seeking this asset freeze and an unnecessary repatriation order.  Equally inexplicable, while the SEC's counsel has had the letter of intent ("LOI") for this potential deal since late August and pledged at that time to "take a look at the LOI and let you

know if I have any follow-up questions," the SEC never expressed any concerns about it, choosing, instead, to file this lawsuit and mischaracterize the LOI in the process. Indeed, the SEC now claims this potential deal would deplete the Company's cash-on-hand to the detriment of shareholders, when, in reality, the LOI expressly provides that the combination with Company A would involve only stock consideration and that "Akazoo's cash on hand as of the date of this Letter shall not be used to fund any portion of Akazoo's investment in Company B." *See* Declaration Of Samantha S. Martin ("Martin Decl.") Ex. S at 5. Moreover, a majority of shareholders have to approve such a deal in any event. *Id.* at 1.

Meanwhile, the Company has been actively negotiating with shareholders to try to align interests to achieve a global resolution here that stakeholders appreciate could contribute to making them whole (or as close to it as possible), as reflected in the letters of support from them now submitted in opposition to this application.[1] But the SEC ignored all of these considerations and rushed into court to freeze assets which are insufficient to make stakeholders whole and at least some of which are needed to fund efforts to continue the negotiation progress.

By focusing myopically on freezing the Company's cash-on-hand as the only potential source of recovery for shareholders, the SEC misses the much bigger picture. The Company— from the day it first learned of potential wrongdoing and self-reported to the SEC—has worked tirelessly to maximize recovery for shareholders by pursuing all potential sources of value.

---

[1] For example, Toscafund, which controls or manages funds comprising almost 50 percent of the Company's shares, now writes the Court that it "does not support" the SEC's asset freeze application and does "not believe . . . a freeze would be in the best interests of the Company's shareholders." Mastro Decl. Ex. D. Toscafund explains to the Court that an asset freeze "would hinder—if not effectively terminate—the Company's ongoing efforts to negotiate with major shareholders a complex global resolution designed to maximize value for all Akazoo shareholders," and "would foreclose to Akazoo's shareholders certain value-enhancing business opportunities, including transactions that are in active negotiations and are supported by Toscafund." *Id.* Moreover, Lead Counsel for Lead Plaintiffs in the federal securities class action brought on behalf of Akazoo investors and shareholders has written the Court that he too "support[s] continuing" the parties' "good faith" ongoing "efforts" to achieve "a global resolution." Mastro Decl. Ex. E.

These efforts have included engaging in multilateral negotiations with all major shareholders in an effort to broker a global resolution by, *inter alia*, agreeing on the allocation to shareholders of all the cash-on-hand in partial settlement of claims brought or that could be brought by shareholders; maximizing potential insurance coverage payouts, which too can be distributed to shareholders; offering shareholders information without having to fight in discovery for documents and information concerning third parties who may have culpability; negotiating a potential transaction that could provide a significant source of value to shareholders wishing to participate, and that would protect for shareholders the cash-on-hand; and cooperating extensively with the SEC and another governmental authority in their investigations of the Company since it self-reported the fraud to those authorities and offered its cooperation. As a further demonstration of the Company's ongoing good-faith efforts, the Company voluntarily repatriated to the United States essentially all cash held by the Company in overseas accounts at the SEC's request. The SEC flatly misstates the factual record on these points and the nature and extent of the Company's cooperation, which has been extensive and exemplary.

Furthermore, contrary to the SEC's faulty assessment, the proposed transaction, if consummated, would create an online gaming and music streaming business that should have meaningful current value and substantial growth potential for current shareholders should they choose to participate. The SEC's fundamental misunderstanding of the transaction now threatens to foreclose the deal. But the SEC has chosen to substitute its "business judgment" for that of the sophisticated negotiating parties, somehow reaching the conclusion that the potential transaction will not provide value to shareholders when the shareholders themselves have concluded otherwise and the Company's Board is trying diligently to maximize value for all shareholders, consistent with its fiduciary duty.

The Court should deny the SEC's extraordinary and misguided request to freeze all assets.  But if the Court decides to freeze assets, the Court should carve out sufficient funds so that the Company's ongoing expenses may be paid, thereby permitting the Company to continue its efforts to maximize shareholder value.  Without an adequate carve-out, the Company in effect will have to cease its value-maximizing efforts.  No sensible director, for example, would continue to serve without a paid-up D&O policy.  Nor would they continue to serve as directors for free.  The minimum staff remaining with the Company would have to be terminated.  Legal counsel would not be available to negotiate the potential transaction to completion.  Nor to continue negotiating resolution to litigation that has already been brought on behalf of a shareholder class and that has been threatened by others.  Nor to assist government authorities and counsel for shareholders in obtaining the information they may need to pursue others who share culpability for the fraud, as the Company has offered to do.  Nor to negotiate with insurance carriers to obtain maximum proceeds that could be distributed to shareholders.  There would be no supporting efforts, such as audit assistance, that go along with negotiating a potential transaction.  Of course, cooperation with the SEC and any other governmental authority, by necessity, would be reduced to a bare minimum, leaving the SEC, for example, to find, collect and process documents for itself and at its own cost.  And perhaps potential witnesses with no culpability (resident in the U.S. and outside it), who nonetheless possess useful information, will be willing to prepare for and speak to the SEC without counsel, or dip into their own pockets to retain counsel.  But experience says not to count on that.

In sum, the Company, having investigated and disclosed the fraud publicly and having self-reported to the SEC and another governmental authority, should not have all its assets frozen. A repatriation order is unnecessary now that the Company's more than $30 million cash-

on-hand has been voluntarily moved to this country, and in any event, the parties are engaged in good faith negotiations to resolve any remaining issue concerning the minimal assets remaining overseas. Similarly, an accounting is something the parties should be able to work out in their ongoing good faith negotiations.  But a complete freeze order would frustrate the efforts that the Company is pursuing to make shareholders whole or as close to it as possible.

## FACTUAL BACKGROUND

A.    **The MMAC-Akazoo Business Combination.**

On September 11, 2019, Akazoo S.A. ("Akazoo" or the "Company") was formed as a result of a business combination between Modern Media Acquisition Corp. ("MMAC") and Akazoo Limited.  *See* Declaration Of Mark A. Kirsch In Support Of Akazoo's Opposition To Plaintiff's Emergency Application ("Kirsch Decl.") Ex. A; Martin Decl. Ex. F.  MMAC was a special purpose acquisition company ("SPAC") established for the purpose of entering into a business combination with one or more entities in the media, entertainment, or marketing services industries, and Akazoo Limited was a company held out by its management as a successful music streaming service operating in emerging markets.  *See* Kirsch Decl. Ex. A.

During the course of MMAC's due diligence prior to the business combination, Akazoo Limited management misrepresented critical facts regarding its business, operations, and financial results to MMAC shareholders and PIPE and individual investors—including that, among other things, Akazoo Limited had millions of registered users and paid subscribers and had generated tens of millions of dollars in revenue in 2018.  *See* Kirsch Decl. Ex. A; Martin Decl. Ex. E.  Unbeknownst to the investors who ultimately approved the business combination, these representations regarding Akazoo Limited's revenue and subscribers—among others— were false.

**B.     The Company Acted Swiftly to Identify the Fraud and Immediately Self-Reported to the SEC and Began Cooperating.**

On or about April 20, 2020, Quintessential Capital Management ("QCM"), a short-selling hedge fund, released a report alleging, in essence, that Akazoo was a fraud.  *See* Kirsch Decl. ¶ 4; Martin Decl. Ex. B.  Among other things, the QCM report claimed that, contrary to representations made by Akazoo Limited management to investors prior to the business combination, Akazoo had only negligible subscribers and revenue.  *See id.*

The Company's Board of Directors promptly formed a special committee of independent directors (the "Special Committee") to investigate the allegations, and engaged outside counsel, Latham & Watkins LLP ("Special Committee Counsel"), and FTI Consulting, Inc. ("FTI") to assist with its efforts.  *See* Kirsch Decl. ¶ 4.

The Special Committee and its advisors immediately began working diligently to investigate the allegations in the QCM report.  On May 1, 2020, approximately one week after the Special Committee initiated its investigation, the Company announced that it had terminated its CEO Apostolos N. Zervos for cause, and that it had appointed Michael Knott of FTI as interim CEO.  *See* Kirsch Decl. ¶ 5; Martin Decl. Ex. E.  The Company also identified certain financial statements on which investors should no longer rely.  *See id.*

On May 21, 2020, the Company announced that the Special Committee had determined that  "former members of Akazoo's management team and associates defrauded Akazoo's investors, including [MMAC], by materially misrepresenting Akazoo's business, operations, and financial results as part of a multi-year fraud."  Kirsch Decl. ¶ 5.  In particular, the Special Committee determined that the Company "had only negligible actual revenue and subscribers for years and that former members of Akazoo management and associates participated in a sophisticated scheme to falsify Akazoo's books and records, including due diligence materials

provided to MMAC and its legal, financial, and other advisors in connection with the Akazoo business combination in 2019." *Id.*  The Company also announced that it had received, and intended to consent to, a letter from Nasdaq stating that the Nasdaq Listing Qualifications staff had determined to delist the Company's securities.  Martin Decl. Ex. E.  And it reported that it had directed its advisors to make referrals to and cooperate with appropriate regulators.  *Id.*

Since alerting the SEC and another governmental authority on May 21, 2020, the Company has provided substantial assistance and full cooperation to their investigations.  As the SEC acknowledges, it has been in frequent communication with both the Special Committee Counsel and Gibson, Dunn & Crutcher LLP ("Company Counsel")—the SEC's papers alone cite twelve videoconferences and teleconferences between May 21, 2020 and August 21, 2020.  *See* Martin Decl. ¶¶ 7–13; Declaration Of Christopher M. Joralemon In Support Of Akazoo's Opposition To Plaintiff's Emergency Application ("Joralemon Decl.") ¶ 3.

The Company and its advisors have also spent significant time and resources voluntarily communicating with the SEC, presenting investigation findings, responding to voluntary requests for information, and producing materials in response to follow-up requests.  *See* Kirsch Decl. ¶¶ 8, 25.  For example, on June 3, 2020, the Company's advisors participated in an over two-hour videoconference with the SEC and another governmental authority, voluntarily sharing the results of the Special Committee's investigation and providing a summary of its review of the Company's cash flow.  *See* Kirsch Decl. ¶ 8.  On July 7, 2020, at the SEC's request, the Company once again made its advisors available for an over two-hour meeting with the Commission and another governmental authority to provide even more detail regarding the Company's finances.  *Id.*  Thereafter, again at the SEC's request, the Company's advisors performed additional financial analysis and voluntarily provided further information regarding

the Company's funds.  *Id.*  Contrary to the SEC's representations, the Company's advisors did

not in any way suggest on the July 7, 2020 call that Akazoo should not be "market tested" to see

if there was potential additional value to be realized when combined with other assets or with

another business.  *See* Declaration Of Michael Knott In Support Of Akazoo's Opposition To

Plaintiff's Emergency Application ("Knott Decl.") ¶ 4.  Further, the Company's advisors were

clear that a formal valuation of the Company's IP had not yet been performed and even noted

during the call that the recommendation engine intellectual property could represent material

value for a third party and that the value of patents could extend beyond the value to Akazoo.

*See id.* ¶ 5.

The Company also has voluntarily produced thousands of pages of materials to

governmental authorities.  In May and June 2020, the Company voluntarily produced over three

thousand pages of materials to the SEC, including the Company's bank statements between

January 2018 and April 2020, and key documents uncovered during the Special Committee's

investigation.  *See* Joralemon Decl. ¶ 4.  Over the past several weeks, the Company has made

regular productions in response to the SEC's July 31, 2020 subpoena, producing many thousands

of pages of documents, including financial information and the entire virtual data room of

diligence materials established in advance of the business combination between the Company

and MMAC.  *See id.* ¶ 7.

Indeed, the Company has complied with the SEC's subpoena and has often produced

more than was requested.  *Id.* at ¶ 6.  On September 23, 2020, the Company voluntarily produced

its August 2020 bank statements, which were beyond the scope of the SEC's subpoena.  *Id.*  And

the Company is currently preparing to produce approximately 30,000 documents pursuant to a

confidentiality and claw-back agreement with the SEC.  *Id.* at ¶ 8.

The Company will continue its cooperation with the SEC and provide assistance to authorities as long as it has the resources necessary to do so.

## C.  At the SEC's Request, the Company Repatriated Its Funds to the United States.

The Company commenced the process of repatriating its funds at the SEC's request months ago and has worked diligently to effectuate the transfer, which was recently completed. *See* Joralemon Decl. ¶¶ 9–13; Kirsch Decl. ¶ 21.  Contrary to the SEC's mischaracterizations, the Company took good-faith steps to facilitate this process.  Specifically, in discussions with the SEC regarding the transfer, Company Counsel advised the SEC that the Company had transferred Akazoo's funds from Luxembourg to the United Kingdom.  *See* Kirsch Decl. ¶ 21. Company Counsel also explained to the SEC that it wanted to understand the tax implications before transferring the funds outside of the European Union and to the United States—necessary considerations before sending millions of dollars overseas.  *See id.*  The Company initiated the transfer process during the week of August 17, 2020.  *See* Joralemon Decl. ¶ 10.  The process took several weeks to complete for reasons outside the Company's control, including bank due diligence required to open a new account.  *See id.* Kirsch Decl. ¶ 22; Joralemon Decl. ¶ 11. Company Counsel kept the SEC informed every step of the way.  *See* Joralemon Decl. ¶ 9.

Throughout its cooperation, the Company has also kept the SEC apprised of the Company's cash-on-hand.  *See* Kirsch Decl. ¶ 25; Martin Decl. Ex. K.  The SEC expresses alarm at the amount of money the Company has spent since April 2020, *see* Plaintiff's Memorandum Of Law In Support Of Its Emergency Application For An Order To Show Cause, Asset Freeze, And Other Relief ("SEC's Memorandum of Law") at 5, but the SEC fails to recognize the compelling reasons for disbursements during this time period.  Necessary funds have been spent since April on the Company's proactive efforts to identify the fraud and assist and cooperate

with the SEC, as well as on essential legal and business services for the benefit of the Akazoo shareholders.

Specifically, Akazoo's recent expenditures are related to: (1) the Company's internal investigation that exposed the fraud and enabled the Company to make referrals to appropriate authorities, including the SEC, and to assist with their investigations; (2) necessary ongoing legal services, including representing the Company in connection with (a) governmental investigations, (b) multiple class action litigations that have been filed against the Company and certain officers and directors, (c) a potential global settlement with shareholders with outstanding claims and threatened claims, and (d) the negotiation of a potential business transaction designed to maximize shareholder value; as well as (3) ordinary business expenses necessary to maintain the Company's operations.

**D.    The Company Is Pursuing a Proposed Global Settlement and Business Transaction for the Benefit of Its Shareholders.**

**1.  Global Resolution**

After learning of the potential fraud, Company Counsel began extensive multi-party discussions in pursuit of a global resolution to maximize value for shareholders. *See* Kirsch Decl. ¶ 23; Declaration Of Randy M. Mastro In Support Of Akazoo's Opposition To Plaintiff's Emergency Application ("Mastro Decl.") ¶ 7. Specifically, Company Counsel is engaged in settlement discussions with counsel for a putative class of shareholders who brought claims in the United States District Court for the Eastern District of New York in an effort to obtain early resolution of such claims, without motion practice and discovery. *See* Kirsch Decl. ¶ 23. Company Counsel has also discussed with certain counsel pursuit of affirmative claims on behalf of multiple stakeholders against tortfeasors that would involve no cost to the Company but generate recoveries to the benefit of all stakeholders. *See* Mastro Decl. ¶ 7. These ongoing

discussions have the potential to result in a global resolution, which would avoid unnecessary and costly litigation.

### 2. Business Transaction

The Company has also been working to maximize shareholder value through a potential business transaction.  The objective of the transaction is to create an online gaming production and distribution business with a music streaming component with the objective of providing meaningful current value and substantial growth potential for current shareholders should they choose to participate.  *See* Declaration Of Mark D. Director In Support Of Akazoo's Opposition To Plaintiff's Emergency Application ("Director Decl.") ¶ 4.  As set forth in the Declaration of Mark Director, the Company evaluated the potential value of selling Akazoo's assets to third parties and was advised by qualified third parties that they were unlikely to attract a meaningful purchase price if sold on a piecemeal basis in their current non-operational form.  *See id.* ¶ 12. Accordingly, the potential transaction is not designed to produce a near-term cash payment to Akazoo.  *See id.*  Instead, the Company has pursued a strategy designed to maximize value and thus enhance the potential recovery for its stockholders by combining with other assets, with the objective of providing meaningful current value and substantial growth potential.  *See id.* ¶¶ 4, 13.

The LOI was signed on August 25, 2020.  *See* Martin Decl. Ex. S.  To be clear, the LOI is not a definitive agreement.  *See* Director Decl. ¶ 2.  Rather, as is frequently the case, the business terms in the LOI are non-binding and remain subject to negotiation and preparation of definitive agreements, the completion of due diligence by the parties, the receipt of board and shareholder approvals, and the satisfaction of closing conditions in definitive agreements.  *Id.*

Under the terms of the LOI, the potential transaction includes three components.  *See* Director Decl. ¶ 3.  First, Akazoo would combine with Company A, an early-stage gaming development company with significant game development opportunities and well-known, veteran leadership in the industry.  *Id.*  The owners of Company A would own 70% of the combined business and the current Akazoo stockholders would own 30%.  *Id.*  Second, the Company would sign a two-year management agreement with Company A and would pay a monthly management fee plus expenses to have the senior executives of Company A assume responsibility for managing the combined business of Akazoo and Company A.  *Id.*  The managers also would receive an equity award in the form of warrants that could be exercisable over time to acquire 10% of the equity of Akazoo at a per share price of $1.16 (the last closing price of Akazoo common stock before it ceased trading on the Nasdaq).  *Id.*  Third, Akazoo and Company A would acquire 60% of Company B, which is an operating online gaming distribution business, for a total investment of $65 million.  *Id.*  Investors identified by Company A would fund $45 million, and one or more current Akazoo stockholders—not Akazoo itself—would fund $20 million.  *Id.*

Although the terms of the LOI are only preliminary, the deal has the potential to enhance shareholder value.  *See* Director Decl. ¶ 13.  Shareholders willing to participate in the new venture would benefit from the upside from the new company, which has the potential to provide meaningful current value and substantial growth potential.  *Id.* ¶ 4.  If the Potential Transaction is completed, the parties also have expressed an intention to seek relisting of Akazoo's stock on the Nasdaq, offering potential liquidity opportunities for participating shareholders.  *Id.*  And, significantly, the Company's largest shareholder is considering subordinating claims it may have to cash payments related to any global settlement process in exchange for an increased share of

the future value of the Company, allowing other shareholders to receive priority cash payouts. *See id*. ¶ 14.

The SEC grossly mischaracterizes Company Counsel's description of the potential transaction, the preliminary terms of the potential transaction, and the purpose of the potential transaction. Company Counsel has been consistently forthcoming with the SEC about the negotiations, representing that discussions with counterparties were fluid and ongoing, and that terms therefore were not set. *See* Kirsch Decl. ¶ 11. Contrary to the SEC's characterizations, Company Counsel never stated that the deal had certain value. *See id*. ¶ 15. First, an LOI obviously is not a final agreement. *Id.* ¶ 14. The title itself—letter of "intent"—makes that clear. And it is equally obvious from reading the LOI that not all terms that will need to be in a final agreement are yet accounted for. Further, in addition to the terms that are not accounted for in the LOI, there can be further negotiation that may vary the terms that actually remain in the LOI. *See* Kirsch Decl. ¶ 14; Director Decl. ¶ 2.

The SEC's misunderstanding of the LOI is most egregious with respect to the following key features of the potential transaction:

- Company cash would *not* be used to pay the purchase price for any assets in connection with the deal. *See* Kirsch Decl. ¶ 13; Director Decl. ¶ 6. The combination with Company A would involve only stock consideration—there would be no cash consideration paid by Akazoo to acquire the stock of Company A. *See* Director Decl. ¶ 6. Further, paragraph 3 of the LOI explicitly states that "cash on hand as of the date of the letter *shall not be used* to fund any portion of Akazoo's investment in Company B." *id.* The SEC also ignores key protections, including that all proceeds from claims made against the D&O policies and/or third-parties remain for the sole benefit of Akazoo shareholders. *Id.* ¶ 11.

- The deal also does *not* contemplate that Akazoo would pay *additional* management or operating fees. The $100,000 monthly management fee would replace Akazoo's current costs of $100,000 to $150,000 to manage the business. *See* Director Decl. ¶ 8.

- The Commission also takes issue with payment of D&O policies and the indemnification of Company A managers against third-party claims. These obligations are not new. Akazoo is currently paying for a D&O policy, and the continuation of standard D&O insurance protections for the directors and officers of an ongoing business is both customary and essential. *See* Director Decl. ¶ 8. Akazoo likewise already has indemnification obligations with respect to its current officers and directors. *See id.*

- And the $300,000 termination fee, which would only be paid if Akazoo signs a definitive agreement with Company A but then fails to complete the combination with Company A, is a customary, one-time expense that is not at all uncommon in potential transactions like the one at issue here. *See* Director Decl. ¶ 10.

A proper understanding of these features makes clear that the potential transaction has considerable potential upside for shareholders contrary to the SEC's assertions. *See, e.g.*, SEC's Memorandum of Law at 2 (claiming the Company is negotiating to "enter into a speculative business transaction that will put [its] funds at imminent risk of continued dissipation"). Unfortunately, the SEC's fundamental misapprehension of the LOI on these and other points has now prompted the SEC to take drastic action in court instead of seeking clarification and discussing its concerns with the Company, with which the SEC has had an open line of communication for months. Indeed, after Company Counsel produced the LOI on August 28, 2020, SEC counsel acknowledged receipt stating: "I'll take a look at the LOI and *let you know if I have any follow-up questions.*" *See* Martin Decl. Ex. L (emphasis added). Of course, the SEC never once expressed any concerns about the LOI or asked any questions about the nature of its terms, but chose instead to complain to this Court about provisions in the LOI that it has grossly misconstrued and never sought to understand. *See* Joralemon Decl. ¶ 15. This approach—which could have been avoided—severely risks jeopardizing the global resolution and shareholder value. *See* Mastro Decl. ¶ 9.

14

## ARGUMENT

**A.**   **The SEC's Asset Freeze Would Have Deleterious Effects On the Company and Its Shareholders and Must Include a Carve-Out for Ongoing Company Expenses.**

The SEC's requested asset freeze would seriously harm shareholders by undermining Company operations and foreclosing opportunities to maximize shareholder recovery. Accordingly, a limited carve-out in the amount of $6.225 million for necessary Company expenses, including legal counsel and operating costs, is warranted.

A court considering whether to issue an asset freeze must weigh "the disadvantages and possible deleterious effect of a freeze . . . against the considerations indicating the need for such relief." *S.E.C. v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972). "[B]urdensome forms of interim relief require correspondingly substantial justification." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1042 (2d Cir. 1990) (finding that a preliminary injunction freezing trading accounts was too broad).

The SEC's request for a sweeping asset freeze is far outweighed by the deleterious effects it would have on the Company and shareholder value.  The SEC has provided nothing but speculation that the potential transaction will result in value-destroying dissipation, making numerous flawed conclusions about the outcome of the transaction that are neither supported by the LOI nor Company Counsel's statements to date.[2]  Accordingly, the SEC's hasty approach is not only short-sighted, but also reflects serious fundamental misunderstandings.

Contrary to the SEC's claims, the potential transaction would *not* result in the use of new shareholder funds.  The LOI expressly provides that "cash on hand as of the date of the letter *shall not be used* to fund any portion of Akazoo's investment in Company B."  *See* Martin Decl.

---

[2]   The Company acknowledged in its May 21, 2020 Form 6-K that an investigation conducted by the Special Committee determined that "former members of Akazoo's management team and associates defrauded Akazoo's investors."  Martin Decl. Ex. E.

Ex. S (emphasis added).  Further, the SEC overlooks the fact that the transaction is designed to *maximize* value and thus enhance the potential recovery for the Company's stockholders by, among other things, creating an online gaming production and distribution business with a music streaming component with substantial growth potential.  *See* Director Decl. ¶ 4.  Indeed, the potential benefits of the transaction to shareholders are confirmed by the fact that the Company's largest shareholder is considering subordinating claims it may have to cash payments as part of any settlement process in exchange for an increased share of the future venture.  *See id.* ¶ 14.

Moreover, the Company has cooperated fully with the SEC, and there is no claim that the Company has misused funds after the fraud came to light.  In fact, the Company's expenses since April 2020 have instead been largely devoted to—among other things—conducting the internal investigation that exposed the fraud and self-reporting and cooperating with the SEC and another governmental authority.

Even if the SEC could establish a legitimate concern about the expense the Company has incurred in its efforts to understand the facts so that the public could be informed as to whether the hedge fund report had any merit, in order for the Company to cooperate with the SEC and the other governmental authority to which it self-reported; to open negotiations to settle with shareholders who had sued or threatened to sue; to determine whether claims against third parties could provide value to shareholders; to unwind contracts the Company had that no longer would have utility; to understand the myriad legal issues raised by the unfortunate facts the internal investigation uncovered; and to do the many other things necessary if the Company was not simply going to turn out the lights and leave it to others to pick up the pieces—and the SEC has not established such a legitimate concern—such concern would be outweighed by the deleterious effect such a freeze would have on the Company and on shareholder value.

Company Counsel has worked tirelessly to pursue all potential sources of value for shareholders, and those efforts would be jeopardized by a court-ordered asset freeze at this juncture.  The SEC's sweeping request to freeze all cash-on-hand will not only risk these ongoing negotiations and the considerable work that has already been done for the benefit of shareholders, but a freeze would also deprive the Company of the funds necessary to support the Company's operations and continued cooperation efforts—including with the SEC and other governmental authorities.  The Court should not permit this perverse result.  To be clear: without the funds to pay legal fees, for example, the Company will not be able to continue negotiating settlements in pending class action litigations or assist authorities in their investigations.  And without the funds to pay D&O premiums, the Company will no longer have serving directors and will be prevented from proceeding with the potential transaction.  These outcomes do not benefit the Company or its shareholders, and the SEC cites no legal authority supporting an asset freeze under these circumstances,[3] particularly where the subject of the freeze has voluntary complied with the SEC's repatriation request by placing its assets in the United States and has further extensively cooperated with the SEC since it brought the fraud to public light.

Although the Company believes a freeze order is not appropriate, if a freeze is imposed, at a minimum the Company requests an adequate carve-out from any freeze order preserving the Company's ability to meet its ordinary obligations and to maintain counsel for the benefit of the shareholders.  A carve-out of $6.225 million would cover legal fees in connection with two pending class action litigations (which the Company seeks to both resolve and avoid), continued

---

[3]  The Commission cites to cases involving foreign citizens with foreign bank accounts to suggest that Akazoo's status as a foreign company weighs in favor of an asset freeze.  *See, e.g., S.E.C. v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 420 (S.D.N.Y. 2001); *S.E.C. v. Sonja Anticevic, et al.,* 2005 WL1939946 (S.D.N.Y. Aug. 5, 2005).  These cases are inapposite, as Akazoo has already transferred funds to a bank account in the United States.  Moreover, they do not support freezing the entirety of a company's cash reserves, particularly when no present misuse has been alleged.

cooperation with the Commission and with another governmental authority investigating the Company, ongoing negotiations related to the potential transaction and a global resolution with stakeholders, and the D&O insurance renewal necessary for the continued operations of the Company.  *See* Mastro Decl. ¶¶ 2–6.  The carve-out also would cover unpaid legal fees for Company Counsel, other accounts payable, the premium on the Company's D&O policy, and essential Company operating expenses, including advisory, accounting, and board fees, in addition to other basic expenses to keep the lights on.  *See* Mastro Decl. ¶ 5.

**B.**     **The SEC's Additional Requested Relief Is Unnecessary and Unduly Burdensome.**

   **1.  The Commission's Request for Repatriation Is Effectively Moot.**

   Consistent with the Company's continued good-faith efforts to cooperate with the Commission, the Company voluntarily moved essentially all of the Company's funds to the United States, effectively mooting the SEC's repatriation request.  As the SEC concedes, this transfer of funds, which involved considerable effort on the part of the Company to establish a new banking relationship, was initiated long before the SEC's purportedly urgent application, and the funds arrived in the new account last week.  Moreover, the parties are engaged in good faith discussions to resolve any open questions concerning the Company's minimal assets located overseas.

   **2.  The Sworn Accounting Sought By The SEC Is Unnecessary and Unduly Burdensome.**

   The SEC's request for a sworn accounting is an overreach and would be prohibitively expensive for the Company.  Akazoo already has identified for the Commission the entities and accounts currently holding Company funds or assets, as well as account balance information.  As discussed *supra*, the Company has produced its bank statements from January 1, 2018 to August

31, 2020, and its advisors made multiple presentations to the SEC regarding the Company's cash flow.

The SEC's Proposed Order also contains additional requests that are excessively broad and cover information already provided by the Company.  For example, in addition to demanding that the Company identify the amount, date, and financial institution associated with all transfers or payments of funds from investors or clients in connection with the activities alleged in the Complaint, the Proposed Order requires, among other things, that the Company provide "in detail, the precise disposition of each transfer or payment," including "the nature and results of any investment in which the funds were used," "any subsequent transfer or payment of the funds," and "any fees or expenses charged."  These details are not readily available to the Company, and complying with these requests would require costly investigation.

Again, the parties currently are engaged in good faith negotiations concerning the SEC's request for an accounting, and we expect to reach agreement on this issue.  Therefore, we respectfully request that the Court order the parties to submit a refined proposed order that addresses the unnecessarily burdensome aspects of the SEC's Proposed Order.

### 3.  The SEC's Proposed Order Also Contains An Overbroad Request for Additional Company Information.

The Proposed Order also requires that the Company submit in writing a list of, among other things, all street and mailing addresses, telephone numbers, electronic mail addresses, safety deposit boxes, and storage facilities used by the Company since *May 2015*.  The SEC does not even mention the need for such overly broad information, let alone attempt to justify it, anywhere in its application for emergency relief.  The SEC's supporting papers, which only address the use of investor funds since September 2019, do not support this request.  Further, collecting this information would be another costly (and irrelevant) exercise for the Company.

We have raised these concerns with the SEC, the parties are continuing to meet and confer, and we expect to reach agreement on the Company's provision of certain information referenced in the Proposed Order.

*   *   *

To preserve the resources of the Company and the Court, the Company respectfully requests that instead of granting the SEC's emergency request for relief, the Court order the parties to meet and confer to negotiate and refine the scope of and all aspects of the SEC's request.  This opportunity would allow the Company to continue to cooperate with the SEC (as it has done since the inception of its investigation) and also to provide the SEC with the information it requires without needlessly draining the Company's resources.

## **CONCLUSION**

Accordingly, for the foregoing reasons, the Company respectfully requests that the Court deny the SEC's emergency application.

Dated:   October 6, 2020
        New York, New York

                                      GIBSON, DUNN & CRUTCHER LLP


                                      By: */s/ Randy M. Mastro*
                                            Randy M. Mastro
                                          Mark A. Kirsch
                                          Christopher M. Joralemon

                                      200 Park Avenue
                                      New York, NY  10166-0193
                                      Telephone:  212.351.4000

                                      *Attorneys for Defendant Akazoo S.A.*